UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HUEI-CHUEH (JESSICA) CHEN, )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>ELI LILLY & COMPANY, )<br>)<br>Defendant. ) | CASE NO. 1: 05-cv-0916-DFH-TAB |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Huei-Chueh (Jessica) Chen worked as a data analyst for defendant Eli Lilly and Company from January 1999 until her termination in January 2004. Chen claims that in discharging her, the defendant unlawfully discriminated against her on the basis of race and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* Lilly contends that Chen was terminated because of her long history of performance problems. Lilly has moved for summary judgment on all claims. For reasons stated below, Lilly's motion for summary judgment is granted.[1]

---

[1] Chen's complaint also included claims for sex discrimination under Title VII, discrimination in her pay under the Equal Pay Act, 29 U.S.C. § 206(d), and retaliation for requesting leave under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* Plaintiff has since acknowledged that she lacks sufficient evidence to pursue these claims. Pl. Br. at 1 n.1.

*Summary Judgment Standard*

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's ruling on a motion for summary judgment is akin to that of a directed verdict. The essential question for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255. If the non-moving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

*Facts for Summary Judgment*

Plaintiff Huei-Chueh (Jessica) Chen was born in 1963 in Taipei, Taiwan. She moved to the United States in 1988 to enroll in a masters program at Purdue University. She eventually received degrees in agricultural economics from West Texas A&M University and computer information systems technology from Purdue.

Defendant Eli Lilly and Company is an Indiana-based pharmaceutical company. In January 1999, Lilly hired Chen as a data analyst for its Global Data Availability Department. In October 2000, Chen transferred to the Global Business Integration Project Data Management Team ("GBIP Team"), where she worked in a group of five to eight employees. Chen performed a variety of tasks with the GBIP Team, including programming code review, data conversion, and data mapping.

For the first fifteen months with the Data Management Team, Chen reported to supervisor Jim Eckert, with whom she had a positive working relationship. Chen testified that Eckert "was a very nice person to work with" and was "very supportive." Chen Dep. 42. Nevertheless, when Eckert completed a performance review of Chen's work from 2001, he rated her performance as a "one" on a scale from zero to three. Feltz Aff. ¶ 4. This made Chen the lowest-rated member of the GBIP Team going into 2002.

Eckert was promoted in early 2002 and Chen began working for new supervisor James Feltz. Feltz initially responded in a positive manner to Chen's work. The first signs of conflict between Chen and her new supervisor began to appear a few months into Feltz's tenure, after Chen approached Feltz in February or March 2002 about transferring to another department. Feltz denied her request pursuant to a Lilly policy requiring employees to remain in their positions for two years before moving. Chen Dep. 64. Chen still had several months before she would qualify for such a move.

After Chen's transfer request was denied, Feltz noted a drop-off in her performance at work. She expressed a distrust of her supervisors. Feltz Aff. Ex. A. Feltz also noted that Chen was resistant to constructive feedback and had been arriving late for work. This behavior was contrary to the goals of a Performance Management Plan that Chen and Feltz had prepared for 2002. *Id.* After consulting with Lilly's human resources department, Feltz issued Chen an oral warning in April 2002. *Id.* During Feltz's tenure as the supervisor of the GBIP Team, this was the only instance in which he issued an oral warning. Feltz Dep. at 50-51.

By July 2002, tension between Chen and Feltz had temporarily abated. During Chen's mid-year performance review, Feltz told Chen that he was happy with her work and that, in light of the improvement, the oral warning was "off." Chen Dep. 115.

In November 2002, Chen's two cats became ill. Feltz allowed Chen to do some work from home in order to care for her pets. Chen's schedule became more regimented by late November, when Feltz assigned her to a new project that would not allow her to work non-standard hours from home. Chen Dep. 129-32. Chen instead was required to work 8-hour days in the office until the conclusion of her new assignment. Feltz Aff. Ex. B. Around the same time, Feltz informed Chen that her performance during prior months had been unacceptable on a number of levels. On several occasions, Chen had arrived late for work. Feltz Aff. Ex. B. Chen had twice missed morning staff meetings completely and once had walked in late. *Id.* Feltz also expressed dissatisfaction with the quality of Chen's work product. *Id.*

In January 2003, Chen received permission from an upper-level manager at Lilly to apply for open positions in other groups. Chen Dep. 156-57. Feltz wished her luck in her search. Feltz Aff. Ex. 9. He also, however, told her that "it might be difficult for him . . . to give a reference" to another supervisor. Chen Dep. 157. Feltz said he "would have nothing good . . . to say about" Chen. *Id.* at 296.

After Chen's attempt to transfer, she noticed a change in the kinds of work she was being assigned. Feltz no longer gave her any technically challenging projects with the GBIP Team. Instead of working on more interesting data conversion projects, Chen was given technical-writing assignments. According to

plaintiff, this was because she was seeking a transfer. Feltz gave Chen the impression that it would be a waste of money to train her for a project if she was eventually going to transfer to another group. Chen Dep. 54.

One month after Chen's transfer attempt, Feltz issued Chen a written warning for unacceptable job performance. Chen Dep. 204. Feltz observed that Chen's work product had been unsatisfactory during that period. He specifically mentioned one project (the "Personnel Administration Tool Validation Plan") that Chen had submitted with incomplete content. Feltz Aff. Ex. C. Chen's "Data Management Website" had a non-intuitive and unconventional design. Chen had also continued to arrive at work late and had missed a number of staff meetings. *Id.*

In the months following Chen's written warning, Feltz did not observe an improvement in her performance. Among Feltz's complaints was Chen's failure to make the appropriate changes to the second draft of her Data Management Website. Feltz Aff. Ex. D. Around this time, Chen lodged her own complaints against Feltz. In May 2003, Chen met with an upper-level manager with Lilly and voiced her lack of confidence in Feltz due to his lack of an IT background and inability to understand how programming works. Compl. ¶ 36. She voiced similar concerns about Feltz to Lilly chief information officer Roy Dunbar and human resources manager Chris Gunn. *Id.*

In July 2003, Feltz placed Chen on six-month probation. *Id.* Problems continued, however, shortly after Chen was placed on probation. Two days after the probation began, Chen presented Feltz with a draft Performance Management Plan that contained sarcastic suggestions for self-improvement. Chen also continued to struggle in terms of work product . In August 2003, Feltz noted that Chen's updates of the Data Management Website introduced code errors that required several days to correct. Feltz Aff. Ex. E.

The basement of Chen's home flooded around September 2003. Feltz approved a month-long leave of absence for her to deal with the flooding, despite restrictions Lilly normally imposed on probationary employees. When Chen returned to work, however, her performance problems persisted. Chen failed to prepare for an October 2003 meeting she was asked to conduct. This caused delays that required the meeting to extend to two additional one-hour sessions. Feltz Aff. Ex. E. In November 2003, Chen took over two weeks to complete a task that her supervisor originally estimated should take only one week. *Id.* A co-worker completed a similar task within a few days. *Id.* Chen also continued to question Feltz's authority, once posting a criticism of Feltz on a board that was largely intended for employees to offer improvements to company projects. *Id.*

By December 2003, Feltz consulted with Lilly's human resources department and agreed to terminate Chen's employment. The stated reason was Chen's unacceptable work performance. Bruce Steinman, the manager of the

GBIP Team, agreed with the decision to terminate. In January 2004, Feltz and a Lilly human resources representative met with Chen and told her she was being terminated. Chen Dep. at 254. Additional facts are included below, keeping in mind the standard applicable on summary judgment. The absence of any reference to indications of age and/or race–national origin bias in the foregoing account of the facts is no accident.

*Discussion*

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. The ADEA makes it unlawful for a covered employer to discharge any individual because of her age if she is at least 40 years old. 29 U.S.C. §§ 623(a), 631(a). Chen was 40 years old when her employment was terminated.

A plaintiff bringing an employment discrimination claim under the ADEA and Title VII may prove her claim using either or both of the "direct" and "indirect" methods of proof. See *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003). Chen does not attempt to meet her initial burden under the indirect method, nor does she seriously contest the factual foundation for Lilly's numerous legitimate, non-discriminatory reasons for terminating her.

Chen instead attempts to proceed under a variation on the direct method of proof. Under the direct method, Chen must offer either direct or circumstantial evidence indicating that Lilly's employment actions were motivated by racial discrimination. *Cerutti*, 349 F.3d at 1061. While truly direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000), a plaintiff can still prevail by assembling a "convincing mosaic" of circumstantial evidence pointing to a defendant's discriminatory motive. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Chen acknowledges that she lacks any "smoking gun" direct evidence of discrimination. She contends that she can construct such a mosaic of evidence that would allow a reasonable jury to infer that she was terminated because of her race and/or age.

The Seventh Circuit has recognized three types of circumstantial evidence that can make a convincing mosaic – individually or in combination:

> The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's

> stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

*Id.* at 736 (internal citations omitted). Whether circumstantial or not, this evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); see also *Troupe*, 20 F.3d at 737 (circumstantial evidence must allow a rational trier of fact to "reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class").

Chen claims that as the only Chinese-American employee in her work group and as an older individual, she was treated worse than her co-workers in a number of ways. She thus attempts to build her mosaic from only the second type of circumstantial evidence. Chen focuses on three episodes in which Feltz subjected her to adverse treatment prior to her termination in January 2004.

Chen's first example of allegedly discriminatory treatment took place in late 2002, when supervisor Jim Feltz refused to support her effort to transfer to another position in Lilly.[2] Feltz allegedly told Chen that he "would have nothing good . . . to say about" her and that it would therefore "be difficult for [her] to transfer." Chen Dep. 296. After Chen's transfer attempt, Feltz stopped assigning

---

[2]Chen had originally asked for a transfer in late 2001. Her request was denied because of a change in Lilly policy that required employees to remain in their positions for two years before transferring to another area. Chen Dep. 63.

her technically challenging projects. The second episode occurred in December 2002, when Feltz required Chen to adhere to unique scheduling restrictions. Beginning that month, Chen was not allowed to make up any time missed during Lilly's core working hours of 9 a.m. to 3 p.m. Other GBIP employees were given the latitude to make up these core hours on later dates. Finally, Chen points out that she was the only employee to whom Feltz issued an oral reprimand (in April 2002) and written warning (in July 2003) during his tenure as the supervisor of Lilly's GBIP Team.

While this evidence suggests that serious tension existed between Chen and her supervisor, there is simply nothing that indicates this tension was because Chen was Chinese-American or older (not quite 40 or just 40 years old at the time of these events). While Chen's examples of adverse treatment are not inconsistent with race or age being the reason why Feltz singled her out, there simply is no evidence that would allow a reasonable inference, as opposed to speculation or guesswork, that Feltz was hostile to her or seeking to get rid of her *because* of race or age. See *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1054 (7th Cir. 2006) (evidence indicating that supervisor wanted to get rid of three employees who happened to be the oldest in the supervisor's chain of command does not establish, in and of itself, that they were fired because of their age). Fatal for Chen's claims is her inability to point to even one similarly situated non-Chinese or younger employee who fared better under her supervisor. See *Troupe*, 20 F.3d at 737 ("Second is evidence, whether or not rigorously statistical, that employees

*similarly situated* to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment") (emphasis added).

Chen was subject to a set of disciplinary actions unique among her co-workers, but the undisputed facts also show that she had a singular history of work-related problems. See *Radue*, 219 F.3d at 617 (7th Cir. 2000) (for a co-worker to be "similarly situated" for purposes of the indirect method of proof, that co-worker must be comparable with regards to performance, qualifications, and conduct). After 2001, Chen's previous supervisor (James Eckert) evaluated Chen as the lowest-rated member of the GBIP Team. During Feltz's tenure, Chen had a long-running problem with tardiness. She arrived late to work on a number of occasions leading up to her April 2002 warning. She missed two morning staff meetings completely, and was late to a third. Chen's work-product was also found lacking. In March 2002, Chen failed to provide Feltz with requested weekly updates on one of her projects. In early 2003, Chen failed to provide complete content for one of her projects (the "Personnel Administration Tool Validation Plan"). Feltz also determined that another of Chen's projects, the Data Management Website, had a non-intuitive and unconventional design. Chen made a number of code errors in her August 2003 update of the Data Management Website. These errors required several days to correct. Chen also demonstrated a long history of resistance to Feltz's leadership, frequently questioning both his authority and competence to upper-level management. While

Lilly has established a multitude of ways in which Chen's performance was lacking, Chen has not come forward with evidence of a single co-worker whose track record approached her own.

When a plaintiff attempts to establish discrimination with a mosaic of circumstantial evidence, "a number of weak proofs can add up to a strong proof." *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006), quoting *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004).  In this case, however, none of the pieces of Chen's mosaic amount to even weak proof that Feltz's actions were motivated by discriminatory animus.  On this record, no reasonable jury could find by a preponderance of the evidence that Lilly fired Chen because of her race or age.  Lilly is entitled to summary judgment.

*Conclusion*

For reasons stated above, the court grants defendant's motion for summary judgment (Docket No. 35) on all claims.  Final judgment shall be entered accordingly.

So ordered.

Date: May 4, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

-14-

Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com

Adrienne Franco Busby
BAKER & DANIELS
afbusby@bakerd.com

Kenneth E. Lauter
HASKIN LAUTER LARUE & GIBBONS
klauter@hlllaw.com

Jay  Meisenhelder
HASKIN LAUTER LARUE & GIBBONS
jmeisenhelder@hlllaw.com